Filed 4/12/22  In re Josiah E. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re JOSIAH E., a Person Coming Under the Juvenile Court Law. | B313237 (Los Angeles County Super. Ct. No. 21CCJP00858A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. JOSHUA E., Defendant and Appellant. | |

APPEAL from findings and an order of the Superior Court of Los Angeles County.  Jean M. Nelson, Judge.  Affirmed.

Janette Freeman Cochran, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Christine S. Ton, Deputy County Counsel, for Plaintiff and Respondent.

_____

Joshua E. (father)[1] appeals from the juvenile court's orders assuming jurisdiction over his son, Josiah E. (Josiah, born Jan. 2017), and removing him from his care. (Welf. & Inst. Code, §§ 300, 361.)[2] He contends that (1) the jurisdictional findings are not supported by substantial evidence; and (2) the juvenile court's removal order is not supported by substantial evidence.

Because the juvenile court's jurisdictional findings and removal order are supported by substantial evidence, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

*Detention Report (Feb. 25, 2021)*

On December 22, 2020, the Los Angeles Police Department received a call regarding physical abuse to Josiah. Officers met with father, who denied striking Josiah. Josiah was described as too young to interview. Officers denied seeing visible injuries to the child. There were no other witnesses to interview.

---

[1] The child's mother, M.F. (mother), is not a party to this appeal.

[2] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

That same day, the Los Angeles County Department of Children and Family Services (DCFS) received a referral[3] wherein it was reported that father was screaming at and hitting or slapping Josiah because the child was crying all night. The reporter also described hearing fighting between the child's parents. The investigation was assigned to a Children's Social Worker (CSW).

Interview with father's transitional housing provider

On December 28, 2020, the CSW interviewed father's transitional housing provider, Ethel Jackson (Jackson). She stated that father had been renting a room in the housing facility and shared a kitchen, bathroom, and living room with other families. Other tenants reported a lot of arguing between mother and father. Jackson also expressed that the other tenants were concerned because they heard Josiah crying and father "'beating'" the child.

Jackson indicated that father was behind on rent and in jeopardy of losing his room. She described father as being "'a little off mentally'" and indicated that father would text her nonsense in the middle of the night. She also described mother as strange, and had observed her jumping around outside, talking to herself, and pacing back and forth.

Initial interview with father

On December 30, 2020, the CSW made contact with father at his home. Father stated that mother was in his room, but he was not willing to wake her up. He also indicated that Josiah was not home and was staying with his paternal great-aunt,

---

[3]    This was not the first referral concerning the family, but prior referrals were deemed unsubstantiated or inconclusive.

3

Charlotte E. (Charlotte), because father's living environment and the people in the homeless shelter were "toxic" for the child. Father denied all of the allegations and said they were lies made up by other tenants in the shelter. He told the CSW that the other tenants were jealous of him and only wanted to cause problems because he was making money and living well.

Father acknowledged spanking Josiah, but denied abusing him. He said that mother was homeless and came in and out of their lives. According to father, he and mother had been in a relationship for about seven years. He then stated that mother did not sleep in his room, but he allowed her to spend time with Josiah. Father said that he did not trust anyone. He did not have friends because they were all "backstabbing and sleep with his baby momma." He refused to provide Charlotte's contact information, but said that he would ask her to bring Josiah to his home the following day.

On December 31, 2020, the CSW received a message from father indicating that he could not meet with the CSW at the scheduled time. The CSW called father. Father answered the phone and was speaking slow and taking long breaks in between answers. Father asked the CSW to meet with him another day.

Interview with Charlotte

On January 4, 2021, the CSW spoke to Charlotte, who confirmed that father had dropped the child off at her home a few days earlier with diapers and clothing. She indicated that the child's paternal grandmother, Latonya W. (Latonya), cared for Josiah while she was at work.

Second interview with father

On January 5, 2021, the CSW interviewed father at his home. Josiah was present in the living room of the shelter and

4

was able to say his name.  The CSW did not note any indications of malnutrition or abuse.  Father denied yelling at Josiah or excessively disciplining him.  Father indicated that he disciplined Josiah by popping him on the butt or on his hand.  He denied leaving marks or bruises on Josiah when physically disciplining him.  Father also denied fighting with mother.  Father denied that mother lived with him, but also said that she was currently staying at his apartment.  He believed that someone in the house called in a referral on him to cause problems.

Father represented that Josiah was potty-trained and only wore diapers at Latonya's home so he did not have accidents.  Father denied a history of or current mental health concerns for himself or Josiah.  He did not have a primary doctor for Josiah and did not intend to vaccinate him.  Instead, father took Josiah to an herb healer because he preferred natural remedies.

Father agreed to drug test for DCFS, but his demeanor and attitude changed when the CSW asked to see his identification to confirm the correct spelling of his name.  Father appeared upset and told the CSW that she was acting like the police.  The CSW was unable to conduct a home assessment thereafter as father indicated that he did not have the key to his room.

Second interview with Charlotte

That same day, the CSW met with Charlotte at her home.  She indicated that Josiah lived with her at times and with Latonya at other times.  According to Charlotte, father had also lived on and off with different family members, but was usually asked to leave because of some type of disturbance.  She described father as having unresolved mental health issues.  Charlotte had discussed taking legal guardianship of Josiah with father, however the process had not yet started.

Charlotte voiced concerns about Josiah in father's care. She stated that Josiah had developmental delays, was not speaking, and had a very limited vocabulary. She also indicated that Josiah exhibited negative behaviors when he returned from father's care, and she was concerned because the child had not seen a doctor. Charlotte was confused as to why father put Josiah in diapers because the child was able to use the restroom.

Charlotte described mother as very physically aggressive, and she had heard from other family friends that mother was placed on a section 5150 hold several months earlier. Charlotte went on to explain that father minimized mother's mental health and that he had become very distant from his relatives since meeting mother.

Home visit

On January 8, 2021, the CSW visited father's home. Father rented a room on the second floor with Josiah and mother. Father did not have clothing for Josiah and indicated that it was all at Charlotte's home. Mother was laying on the bed with a blanket over her head and would not respond to the CSW. Josiah was also in the bed with mother, awake. The CSW did not observe any marks or bruises on him and described the home as appropriate.

Interview with Latonya

On January 12, 2021, the CSW interviewed Latonya at her home. She was concerned for Josiah because he was delayed in his speech and developmental milestones.

Latonya stated that both mother and father suffer from mental health issues, but father had never been diagnosed or assessed. She said that father showed signs of paranoia and split personalities. She described father as fine one moment and then

6

paranoid the next. She said that father has called to tell her that the government was following him and that someone scratched him at the market to get his DNA. She also shared that father spoke about spirits in his closet and random people following him.

Latonya indicated that neither parent acknowledged having a mental health concern. She described mother and father as toxic together. And, father had burned a lot of bridges with his family by staying with mother and defending her.

On January 26, 2021, Latonya informed the CSW that father was sleeping in his car with Josiah. The CSW contacted father, who said that this was a lie.

<u>DCFS visits father again</u>

On January 28, 2021, the CSW went to father's home, but he was not there. The CSW called father and he told the CSW to wait for him. Father arrived, and when he took Josiah out of the car, the child was wearing pajama pants that were a couple of sizes too big. The child was not wearing socks or shoes, and it appeared that he was not wearing underwear or a diaper. When the CSW noticed that the child's shirt was not buttoned properly, father explained that Josiah had dressed himself that morning. Father then called his son an "'asshole'" and indicated that Josiah had been acting up that morning.

The CSW described Josiah as embarrassed, as Josiah was not making eye contact and kept his head down during the conversation with father. The CSW explained to father that Josiah is just a child and needs guidance from father and was still learning. Father replied that Josiah is smart enough to know that when he tells him they are leaving he needs to get ready. The CSW walked over to Josiah and asked him if she

7

could help fix his shirt. Josiah nodded his head and started to take his shirt off. The CSW asked Josiah why he looked so sad and Josiah did not respond. Just then, father said to Josiah, "'[a]in't nobody going to be feeling sorry for you.'" The CSW described Josiah as very sad and scared. Father told the CSW that Josiah is really good at manipulating people and making himself the victim so people feel sorry for him.

The CSW offered parenting resources to father, but father declined and said he was only interested in getting a voucher for another housing facility. An unidentified male who lived in the same housing unit as father said that the reason Josiah appeared so sad was because he had just gotten a "whooping" that morning in the shower. The man indicated that father treats Josiah like a grown male and said that it was no way to treat a child. The man also said that he had pictures and videos of father and mother fighting. While the man said that he did not want to be involved, he also said, "'I mean I don't care I just want the [little] boy to be safe; he might kill him one day the way he hits him.'"

Telephone call with Latonya

On February 1, 2021, the CSW spoke with Latonya by telephone. She had received a text from Josiah's paternal great-grandmother that father left her home without wearing shoes or underwear. The CSW followed up with the paternal great-grandmother, but she would not cooperate and said that she did not want to be involved.

Removal order

A removal order was signed February 16, 2021.

On February 19, 2021, the CSW served mother and father with the removal order. Mother became upset and began calling the CSW and police officers offensive names. Father attempted

to calm mother down, however mother began yelling at father that this was all his fault and calling him obscenities, as well. Josiah was detained and transported to Latonya's home.

*Section 300 Petition*

On February 23, 2021, DCFS filed a section 300 petition on behalf of Josiah. Regarding father,[4] the juvenile court eventually sustained the section 300 petition pursuant to subdivision (b)(1) as follows:

> "b-2 [¶] The child Josiah['s] . . . father, [J.E.] has displayed mental and emotional problems including paranoia and visual hallucinations, which render the father incapable of providing the child with regular care and supervision. The father's mental and emotional problems endanger the child's physical health and safety and place the child at risk of serious physical harm, damage, and danger.
>
> "b-3 [¶] The child Josiah . . . has displayed developmental and speech delays and the child's mother . . . and the child's father . . . have failed to obtain a medical evaluation for the child. Such medical neglect of the child by the child's mother and the child's father endangers the child's physical health and safety and places the child at risk of serious physical harm, damage, and danger."

---

[4]    A count pursuant to section 300, subdivision (b)(1), was also sustained regarding mother.

*Detention Hearing (Feb. 26, 2021)*

At the detention hearing, the juvenile court found a prima facie case that Josiah was a person described by section 300. It detained Josiah from both mother and father, citing to concerns about mother's and father's mental health and their failure to address Josiah's needs. It ordered monitored visits for mother and father. It also ordered that Josiah undergo a medical and mental health assessment. The matter was set for a jurisdictional hearing.

*Jurisdiction/Disposition Report (Apr. 23, 2021)*

<u>Interview with father</u>

Father was interviewed by the Dependency Investigator (DI) on March 31, 2021. Initially, he refused to answer the DI's questions, stating: "'I don't really care to participate in this case anymore. I'm not going to put too much energy into it. I want my son back. You're not making anything easy for me.'" Father denied experiencing paranoia or hallucinations and disagreed that he struggled with any mental health issue. He said that people are just jealous of him and do not want to see him doing well.

When asked about Josiah, father said that his son was healthy, and he did not approve of any more doctor visits for Josiah. Father also objected to vaccinations, citing his belief that vaccines cause autism. When asked about Josiah's development, father stated Josiah had been speaking since he was one year old. He asserted that Josiah is just putting on a baby act and is a good actor. When asked about the child's speech delay, father said that he noticed a change in the child's behavior after being at Charlotte's home. Father then denied that the child had speech delays.

10

<u>Interview with Charlotte</u>

During her interview with the DI, Charlotte indicated that she and her daughter had helped father care for Josiah.

Charlotte reported that Josiah had developmental delays, but he had never been to a doctor because father would not allow it. She said, "'[Josiah] wasn't talking. He would do a lot of grunting and you couldn't understand what he was saying. He was not potty trained so I potty trained him. But when he went back with his dad, he was put back in pampers and pull-ups. He would wet himself.'" She was concerned about Josiah's development.

When asked if she had concerns about Josiah in father's care, Charlotte responded, "'Oh yes.'" She described father as having paranoid behaviors and acting like he thought Charlotte was against him.

<u>Interview with Latonya</u>

Latonya reported that father's mental health concerns began to appear about three or four years earlier. She indicated that sometimes he acts "'regular'" and then at times he is "'extreme.'" She described him as paranoid and said that he always thought people were talking about him. One time, she had received a call from father, and he told her that someone was following him with helicopters and drones. She reiterated that on another occasion, father told her that a woman had scratched him on the arm in order to obtain his DNA. She described father as erratic, and she suspected that both parents abuse drugs.

Latonya indicated that father was not able to take care of Josiah's needs, as father was not able to meet his own needs. She revealed that Josiah had never been to the doctor because both parents were against doctors. She said father always thought

Josiah was just putting on a show, but Josiah was very delayed and not fully potty trained. She further noted that father did not take ownership of his problems and instead blamed everyone else.

Since detention, father had visited Josiah about three times. Josiah tensed up when father visited, and father was not affectionate with the child. Latonya shared that father does not show Josiah affection because he did not want Josiah to be "'feminine.'"

Father's transitional housing provider, Jackson, stated that father had been doing well in the home until mother came back into the picture. She had mental health concerns for father because he used to text her nonsense at odd hours of the night.

Assessment of Josiah

On March 2, 2021, after an assessment, Josiah was diagnosed with autism, behavioral concerns, developmental delays, speech delays, and iron deficiency anemia.

Interview with Josiah

Josiah was unable to respond to most of the DI's questions due to his speech delay. The DI described that at times, Josiah would put his hands over his eyes and turn his body away from the DI. When the DI asked the child with whom he lived, Josiah replied, "'Granny.'" The DI asked Josiah if he wanted to see and/or live with mother or father, Josiah shook his head no. The DI asked Josiah how old he was, and the child responded by saying his name. Josiah was able to identify objects correctly. However, he was unable to formulate meaningful sentences.

DCFS assessment and conclusions

DCFS assessed that father was not able to meet the child's medical and developmental needs. He minimized the child's

developmental delays and conveyed his belief on multiple occasions that Josiah was only pretending not to know how to speak. He also denied that the child needed medical or dental care.

In addition, DCFS expressed concerns about father minimizing mother's behaviors. He denied mother had mental health issues and that she was ever hospitalized for treatment. Father allowed mother to reside with him and have unlimited contact with the child.

DCFS concluded that there were no reasonable means by which the child's physical or emotional health might be protected without removing the child from the physical custody of his parents. It recommended removal of Josiah from mother and father. DCFS also recommended family reunification services for father, and no family reunification services for mother given that her whereabouts were unknown.

*Jurisdiction Hearing (Apr. 23, 2021)*

At the onset of the jurisdiction hearing, the juvenile court received the DCFS's reports into evidence. No other evidence was presented, and the matter proceeded by argument.

After entertaining oral argument, the juvenile court sustained the petition in its entirety. In so doing, the juvenile court stated that father's behaviors "indicate a mental health issue of some type" that is not being addressed. It also reasoned that father's lack of follow through in addressing Josiah's medical needs was directly related to his mental health issues. "[Father] is extremely distrustful of basically everybody and that is a likely reason why he doesn't take the child for medical appointments," and "is in denial about the child's developmental needs."

The matter was continued for a disposition hearing.

13

*Last Minute Information for the Court (May 24, 2021)*

On April 20, 2021, the CSW mailed father referrals for services. The CSW spoke with father on April 26, 2021, and encouraged him to enroll in parenting education classes, mental health services, and to participate in drug testing. At the time of the writing of the report, father had yet to participate in any services. The CSW arranged a monitored visit for father on April 28, 2021. Father did not show up to scheduled visits with Josiah on May 1, 2021, and May 2, 2021.

The CSW also provided an update regarding Josiah's services and summarized that he was immunized and referred to Wraparound services, a Fetal Alcohol Syndrome assessment, Regional Center, and a sleep study.

*Disposition Hearing (May 24, 2021)*

The only evidence presented at the disposition hearing was the DCFS reports.

After argument, the juvenile court declared Josiah a dependent of the court. It ordered removal of Josiah from his parents, reasoning that "father has not enrolled in any services to address these issues," "father has not addressed the problems in this case," and his actions give the court "reason to believe that father is not willing to cooperate and address the problems in this case." The juvenile court found by clear and convincing evidence that there was a substantial danger to the child's physical health and safety if he were returned to the home of his parents and that there were no reasonable means to protect Josiah without removing him from mother and father. It ordered family reunification services for both mother and father.

*Notice of Appeal*

Father's timely appeal ensued.

14

**DISCUSSION**

I. *Standard of review*

As the parties agree, we review the juvenile court's jurisdictional findings[5] and dispositional order for substantial evidence. (*In re E.B.* (2010) 184 Cal.App.4th 568, 574, overruled in part by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7; *In re A.S.* (2011) 202 Cal.App.4th 237, 244, overruled in part by *Conservatorship of O.B., supra,* at p. 1010, fn. 7.) Substantial evidence is evidence that is reasonable in nature, credible, and of solid value. (*In re Alexzander C.* (2017) 18 Cal.App.5th 438, 446, overruled in part by *Conservatorship of O.B., supra,* at p. 1010, fn. 7; *Conservatorship of O.B., supra,* at p. 1010, fn. 7; *In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393.) "[W]e view the record in the light most favorable to the juvenile court's determinations, drawing all reasonable inferences from the evidence to support the juvenile court's findings and orders." (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 992.) "We do not reweigh the evidence, evaluate the credibility of

---

[5] DCFS argues that father's jurisdictional challenge is not justiciable because even if we were to agree with him and reverse the juvenile court's findings, dependency jurisdiction would remain based on the unchallenged findings concerning mother. DCFS is correct. (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451; *In re J.C.* (2014) 233 Cal.App.4th 1, 3 ["Because the juvenile court assumes jurisdiction of the child, not the parents, jurisdiction may exist based on the conduct of one parent only"].) However, because the jurisdictional findings could prejudice father in this or future proceedings, we exercise our discretion to reach the merits of father's arguments. (*In re Daisy H.* (2011) 192 Cal.App.4th 713, 716; *In re Drake M.* (2012) 211 Cal.App.4th 754, 762–763.)

witnesses, or resolve evidentiary conflicts. [Citation.]" (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.)

As the appellant, father must establish that the rulings that he respectively challenges are not supported by substantial evidence. (See *In re R.V.* (2012) 208 Cal.App.4th 837, 843.)

That said, "when a heightened standard of proof applied before the trial court, an appropriate adjustment must be made to appellate review for sufficiency of the evidence." (*Conservatorship of O.B.*, *supra*, 9 Cal.5th at p. 1010.) "In general, when presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, the court must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof." (*Id.* at p. 1005.) In other words, "the clear and convincing standard of proof [has an] effect on appellate review for sufficiency of the evidence." (*Id.* at p. 1010.)

II. *Jurisdiction*

    A. <u>Relevant law</u>

Section 300, subdivision (b)(1), authorizes dependency jurisdiction over a child where "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of [his or her parent] . . . to adequately supervise or protect the child . . . or by the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent . . . to provide regular care for the child due to the parent's . . . mental illness, developmental disability, or substance abuse." (§ 300, subd.

(b)(1).) Three elements are often cited as necessary for a jurisdictional finding under section 300, subdivision (b)(1): "(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the minor, or a 'substantial risk' of such harm or illness." (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 820; see also *In re L.W.* (2019) 32 Cal.App.5th 840, 848; *In re Joaquin C.* (2017) 15 Cal.App.5th 537, 561; *In re Ma.V.* (2021) 64 Cal.App.5th 11, 21–22.)

The first prong "requires no more than [a] parent's 'failure or inability . . . to adequately supervise or protect the child.'" (*In re R.T.* (2017) 3 Cal.5th 622, 629.) It does not require parental culpability. (*Ibid.*)

Although section 300 requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing (*In re J.N.* (2021) 62 Cal.App.5th 767, 775), the juvenile court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child. (*In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1383.) "[T]he court may . . . consider past events when determining whether a child presently needs the juvenile court's protection. [Citations.] A parent's past conduct is a good predictor of future behavior. [Citation.] 'Facts supporting allegations that a child is one described by section 300 are cumulative.' [Citation.] Thus, the court 'must consider all the circumstances affecting the child, wherever they occur.' [Citation.]" (*In re T.V.* (2013) 217 Cal.App.4th 126, 133.)

B. <u>Analysis</u>

Ample evidence supports the juvenile court's jurisdictional findings under subdivision (b). Specifically, there was evidence that father's mental health issues negatively impacted his ability

17

to care for his young son. One of the most illuminating indicators of father's mental illness was his own mistrust of four-year-old Josiah. Josiah was diagnosed with autism, behavioral concerns, developmental and speech delays, and iron deficiency anemia. However, father insisted that Josiah did not have delays or medical issues, but rather that the child was manipulative, feigning his challenges so that people would feel sorry for him. Moreover, father maintained that the child had been talking since age one, despite his diagnosis and notwithstanding observations by Latonya, Charlotte, the CSW, and the DI that Josiah was very delayed in speech and unable to form sentences. Father simply referred to the child as a good actor.

During a meeting with the CSW on January 28, 2021, father displayed troubling conduct toward the child, calling him an "'asshole,'" after he had apparently given him a "whooping" that morning in the shower.[6] At that meeting, the CSW noted that Josiah was wearing pajama pants that were two sizes too big, no socks or shoes, and it appeared he was not wearing underwear or a diaper.

And father was not interested in assistance with how to guide and teach his son. When the CSW offered parenting resources to the father, father declined, stating that he was only interested in getting a voucher for another housing facility.

Father's callous interactions with Josiah demonstrated how profoundly father mistrusts the child's motives and how father's issues negatively impacted the child's well-being.

Furthermore, father's unrelenting mistrust of Josiah and others affected the medical decisions he made on behalf of Josiah.

---

[6] There was other evidence that father beat Josiah.

Despite Josiah's diagnosed delays, father persisted in the belief that the child fabricated his developmental challenges. Father described the child as healthy and objected to any further doctor appointments. Even after his mother and aunt voiced their concerns, father still did not seek treatment for Josiah.

While it is true "harm may not be presumed from the mere fact of a parent's mental illness" (*In re A.L.* (2017) 18 Cal.App.5th 1044, 1050), it is also true that when mental illness causes the parent to make choices that jeopardize the child's safety, the juvenile court may find a risk of harm (*In re Travis C.* (2017) 13 Cal.App.5th 1219, 1226–1227). Here, there was substantial evidence that as a result of father's failure to treat his mental illness, his ability to provide regular care and supervision of his child was impaired.

Furthermore, as set forth above, a current risk of harm can be shown by evidence of past conduct, if there is a reason to believe the conduct will recur. (*In re Savannah M., supra,* 131 Cal.App.4th at p. 1394.) Here, there was no reason to believe that father would ensure Josiah received the necessary medical treatment without court supervision. After all, as set forth above, father had demonstrated poor insight into his mental health challenges and his symptomology negatively impacted his ability to care for Josiah. And, there was no evidence that father was seeking treatment for his mental health issues or that he would be willing to engage if ordered by the court. In fact, father told the DI: "'I don't really care to participate in this case anymore. I'm not going to put too much energy into it.'"

*In re Joaquin C., supra,* 15 Cal.App.5th 537, upon which father relies, is readily distinguishable. In that case, the mother denied having any mental illness, but she exhibited paranoid

beliefs and was described as being bizarre.  (*Id*. at pp. 541–542.)
The child was in the mother's care and she lived with the
maternal grandmother and maternal aunt, who expressed no
concerns regarding her ability to care for her child.  (*Id*. at
p. 542.)  DCFS also noted that during visits with the family there
were no concerns for abuse.  (*Id*. at pp. 541–543, 545–546.)  The
maternal aunt participated in the mother's care as well.  (*Id*. at
pp. 556–557.)  Under these circumstances, there was insufficient
evidence that the mother's condition rendered her unable to
adequately supervise, protect, or provide regular care for her
child.  (*Id*. at p. 564.)

In contrast, in this case, father's mental problems
significantly impaired his ability to provide adequate care for
Josiah.  Further, unlike the mother in *In re Joaquin C.*, father
had minimal family support and little to no community
assistance, let alone an in-home support system to ensure the
protection of Josiah.  Father rented a room in a transitional
housing facility; even he depicted his living environment as
"toxic."  Father did not appear to have a friendly relationship
with the other tenants of the home; in fact, he denied having any
friends.  Father also did not have consistent or reliable support
from the child's mother.  And, father alienated himself from his
own relatives.  Finally, unlike *In re Joaquin C.*, DCFS here had
significant concerns about Josiah's health and safety in father's
care.

Urging us to reverse, father appears to argue that the
juvenile court did not have evidence that he suffered from mental
or emotional problems.  Father goes on to claim that the juvenile
court did not have evidence of actual harm to Josiah and
"[n]othing in the record supported a finding that Father was

20

unable to provide regular care for Josiah, including medical care, as a result of his mental and emotional problems."

Father's contentions are belied by the contents of the appellate record. The record is replete with facts supporting the juvenile court's finding that father suffered from mental and emotional problems and that father failed to obtain medical treatment for Josiah, placing the child at substantial risk of serious physical harm.

Preliminarily, a formal procedure, including expert evidence of mental illness is not required when jurisdiction is based on a parent's mental illness. (*In re Khalid H.* (1992) 6 Cal.App.4th 733, 736.) Despite father's argument that he did not have a "diagnosis" and "[h]e was not on a hold", there is abundant evidence in the record that demonstrates that father struggled with mental and emotional problems, including paranoia and hallucinations.

Paternal relatives described father as having untreated mental health issues. Latonya and Charlotte reported that father suffered from mental illness, but had never been diagnosed or assessed. They also said that father showed signs of paranoia and split personalities. For example, father had called Latonya claiming that the government was following him and that someone had scratched him at the market to obtain his DNA. Latonya also reported that father spoke about spirits in his closet and random people following him.

Father's transitional housing provider also had concerns about father's mental health, describing him as "'a little off mentally.'"

Taken together, this evidence supports the juvenile court's finding that father suffered from mental health issues.

III. *Disposition*

    A. <u>Relevant law</u>

The decision to remove a child from parental custody is only authorized when a juvenile court finds, by clear and convincing evidence, that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1); *In re H.E.* (2008) 169 Cal.App.4th 710, 718.)

"A removal order is proper if based on proof of parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent. [Citation.] 'The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child.' [Citation.] The court may consider a parent's past conduct as well as present circumstances. [Citation.] [¶] Before the court issues a removal order, it must find the child's welfare requires removal because of a substantial danger, or risk of danger, to the child's physical health if he or she is returned home, and there are no reasonable alternatives to protect the child. [Citations.] There must be clear and convincing evidence that removal is the only way to protect the child." (*In re N.M.* (2011) 197 Cal.App.4th 159, 169–170; see also *In re Alexzander C., supra,* 18 Cal.App.5th at p. 451 [focus of the statute is on averting harm to the child].)

"The juvenile court has broad discretion to determine what would best serve and protect the child's interest and to fashion a

dispositional order in accordance with this discretion. [Citations.]" (*In re Jose M.* (1988) 206 Cal.App.3d 1098, 1103–1104.)

B. <u>Analysis</u>

Applying these legal principles, we conclude that the juvenile court's removal order is supported by substantial evidence. As set forth above, father's mental and emotional issues, lack of attention to Josiah's medical and mental health needs, father's complete denial of the issues, and his unwillingness to participate in the case all support the juvenile court's removal order.

Father claims that like *In re Henry V.* (2004) 119 Cal.App.4th 522, there were alternatives to removal, and the juvenile court could have put reasonable safety measures in place instead of removing Josiah from his care. But, by the time of the disposition hearing in this case, father had not engaged in services, missed two scheduled visits, and failed to take responsibility for his actions. (Contra, *In re Henry V., supra,* at p. 529 ["social worker credited [the mother] for being fully cooperative in taking advantage of the services that had been offered"]; see also *In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197 ["One cannot correct a problem one fails to acknowledge"].)

Father's reliance upon *In re Ma.V., supra,* 64 Cal.App.5th 11 is also misplaced. In that case, the appellate court reversed a juvenile court's jurisdictional findings and removal order because its findings were based on stale acts of domestic violence and because the mother had resolved the key concerns that were the basis for jurisdiction. (*Id.* at pp. 23–27.) The fact that the mother had not completed her recommended case plan was

irrelevant because all of her services were voluntary.  (*Id*. at p. 25.)

Here, in contrast, father had not taken any steps to address the issues that led to dependency jurisdiction.  In fact, he had even voiced that he was unwilling to participate in services.  And, father continued to deny that there were significant issues to be addressed, such as Josiah's developmental delays.  Even on appeal, father contends that Josiah was "healthy, well cared for and supervised"; for the many reasons set forth above, that is simply untrue.

## DISPOSITION

The juvenile court's jurisdictional findings and dispositional order are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
ASHMANN-GERST


We concur:


_____, P. J.
LUI


_____, J.
CHAVEZ


24